THE ACRO MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 89281. Filed November 8, 1962.

*H. Brice Graves, Esq.*, for the petitioner.
*Bart A. Brown, Esq.*, for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in petitioner's income tax for the years 1953 and 1955 in the amounts of $26,531.96 and $212,794.49, respectively.

The parties have agreed that the sole issue for decision is whether the sale at a loss, of accounts receivable, inventories, land, and depreciable assets acquired by petitioner upon the distribution in complete liquidation of its wholly owned subsidiary, constitutes a capital loss or an ordinary loss for Federal income tax purposes. If the loss is a capital loss, it is allowable to petitioner only to the extent of capital gains, section 1202, I.R.C. 1954.[1]

### FINDINGS OF FACT.

All of the facts have been stipulated and they are so found. The stipulation of facts and the exhibits attached thereto are included herein by reference.

Petitioner is a dissolved Ohio corporation, the address of which is now c/o Robertshaw-Fulton Controls Company, 911 Broad Street, Richmond, Virginia. The income tax returns of petitioner for its taxable years 1953 and 1955 were filed with the district director of internal revenue, Columbus, Ohio.

During the years here in question, the principal business activity of petitioner was the manufacture and sale of precision switches and thermostatic controls. On December 9, 1954, petitioner acquired all the outstanding capital stock of Universal Button Company (hereinafter referred to as Button), a Michigan corporation, solely in exchange for 55,000 shares of its own voting common stock.

Button was engaged in the business of manufacturing metal buttons for work clothes, which buttons were attached to clothing and other products by machines owned by Button and placed in the plants of its customers upon a rental basis. Button also owned all the outstanding stock of Universal Button Fastening and Button Com-

---

[1] All references herein are to the Internal Revenue Code of 1954 unless otherwise specified. The respondent's determination of a deficiency in petitioner's income tax for the year 1953 is based upon the disallowance of the 1955 loss which would otherwise have been available to petitioner as a net operating loss carryback to 1953.

pany of Canada, Limited (hereinafter referred to as Canada), a Canadian corporation, and 60 percent of the outstanding stock of Universal Fastener Company (hereinafter referred to as Fastener), a Michigan corporation, both of which were operating corporations. The principal business of Fastener was the manufacture and sale of slide fasteners, commonly known as zippers, and the principal business of Canada was the manufacture and sale of buttons.

In March 1955, petitioner was approached by representatives of Talon, Incorporated (hereinafter referred to as Talon), a Pennsylvania corporation, for the purpose of determining whether petitioner would be interested in selling to Talon all the issued and outstanding capital stock of Button or all the property, assets, and goodwill of Button. Petitioner was receptive to the approach by Talon because of certain unforeseen difficulties that had arisen in connection with the operations of Button. Accordingly, negotiations between representatives of petitioner and representatives of Talon were begun.

Preliminary discussions with Talon's representatives revealed to the representatives of petitioner that a sale of the Button *stock* would result in a capital loss to petitioner for income tax purposes. Petitioner's representatives considered such a tax effect undesirable, and were therefore unwilling to negotiate for disposition of Button by means of a sale of its stock.

Further negotiations between petitioner and Talon resulted in the submission, by Talon, of a written offer delivered to petitioner's president, on May 23, 1955, setting forth the price at which and the terms and conditions upon which Talon would be willing to purchase the Button business. At a meeting held on May 24, 1955, the board of directors of petitioner passed a resolution authorizing the chairman of petitioner's board of directors or petitioner's president to accept, on behalf of petitioner, the offer of Talon for the purchase of the Button business. Pursuant to this resolution of the board of directors, petitioner and Talon executed an "Agreement" dated June 17, 1955, which provided, insofar as is relevant to this case, that petitioner would cause Button to adopt a plan of complete liquidation and to distribute its assets, property, and goodwill to petitioner in complete and final liquidation of Button; that, upon acquiring from Button its assets subject to its liabilities in complete liquidation of Button, petitioner would sell and Talon would buy such assets, except the stock of Fastener, subject to the liabilities for an agreed price; and that Talon would give petitioner an option, exercisable between October 15, 1955, and December 1, 1955, to sell the stock of Fastener to Talon or to a subsidiary of Talon at an agreed price.

The board of directors and stockholders of Button, both on June 29, 1955, held meetings at which a plan of complete liquidation of Button

was adopted. On June 30, 1955, Button acquired the remaining 40 percent of the outstanding capital stock of Fastener.

In accordance with the terms of the agreement and pursuant to the plan of complete liquidation, Button was completely liquidated on June 30, 1955, and its assets and liabilities were distributed to petitioner in cancellation and redemption of all of its outstanding stock, all of which stock had been owned by petitioner from December 9, 1954, when it was initially acquired, to the date of liquidation on June 30, 1955. Upon receipt by petitioner of these assets and liabilities, petitioner, also on June 30, 1955, transferred the assets, other than the stock of Fastener and certain corporate records, to Talon, in accordance with the terms of the agreement, and Talon assumed the liabilities relating to the business formerly carried on by Button.

Talon paid petitioner $1,245,837 and assumed liabilities of Button of $286,524 for the stock of Canada and the other assets of Button, except the stock of Fastener, acquired by petitioner on the liquidation of Button. The categories of assets and liabilities transferred by petitioner to Talon, the adjusted basis of each in the hands of Button immediately before its liquidation, and the allocation of the amount received from Talon to each category of assets were as follows:

| Item | Category of assets | Adjusted basis to Button at 6/30/55 | Selling price |
|---|---|---|---|
| 1 | Canada stock | $80,000 | $264,000 |
| 2 | Accounts receivable and prepaid expenses | 221,864 | 221,864 |
| 3 | Inventories | 420,445 | 312,425 |
| 4 | Patents | 2,254 | None |
| 5 | Land, buildings, and other fixed and depreciable assets | 1,162,537 | 734,072 |
| | Totals | 1,887,100 | 1,532,361 |
| 6 | Less: Liabilities of Button assumed by Talon | 286,524 | 286,524 |
| | Totals | 1,600,576 | 1,245,837 |

Petitioner incurred expenses in connection with its June 30, 1955, sale to Talon of $25,375, of which $4,000 was allocable to the sale of the Canada stock and the remaining $21,375 was allocable to the sale of the current assets and land, buildings, and other fixed and depreciable assets of Button acquired by petitioner on the liquidation of Button.

By letter dated November 16, 1955, petitioner notified Talon that it was exercising its option (received as a part of its June 17, 1955, agreement with Talon) to sell to Talon or a subsidiary of Talon the stock of Fastener. On December 2, 1955, Talon caused Crawford Industries, a wholly owned subsidiary, to pay petitioner $115,955, for

which Crawford Industries received from petitioner all the outstanding stock of Fastener. The adjusted basis of the Fastener stock to Button, on June 30, 1955, was $210,000.

The business of Button was actively operated by Button until the time of its liquidation on June 30, 1955, and was continued by Talon beginning on June 30, 1955, after it acquired the business. There was no interruption in the everyday operations of the Button business due to the various transfers described herein which took place on June 30, 1955.

On its income tax return for its taxable year 1955, petitioner reported a capital gain on the sale of stock of Canada in the amount of $184,000, a capital loss on the sale of the stock of Fastener in the amount of $94,045, and an ordinary loss on the sale of other assets received by it in the distribution in liquidation of Button in the amount of $564,114. Respondent, in his notice of deficiency, determined that the claimed loss of $564,114 constituted, for Federal income tax purposes, a capital loss rather than an ordinary loss.

Other issues involved in this case have been disposed of by agreement of the parties.

Since the amount of petitioner's allowable deduction for contributions involves a mathematical computation which can be resolved by the parties, a decision under Rule 50 will be entered herein.

The sale at a loss, of accounts receiveable, inventories, land, and depreciable assets acquired by petitioner upon the distribution in complete liquidation of its wholly owned subsidiary, constitutes a capital loss for Federal income tax purposes.

### OPINION.

The basis for petitioner's contention is concisely set forth on brief. Taking the argument step by step it is as follows. Petitioner's acquisition, on December 9, 1954, of all of the outstanding capital stock of Button solely in exchange for 55,000 shares of its own voting common stock constituted a reorganization within the meaning of section 368(a)(1)(B) of the Code.[2] The distribution of the Button assets to petitioner upon the liquidation was in cancellation and redemption of all the outstanding stock of Button. Accordingly, the provisions

---

[2] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

*     *     *     *     *     *     *

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation * * *

of section 332 [3] apply to the transaction and no gain or loss was recognized to petitioner on the receipt of the property distributed to it in complete liquidation of Button.

With respect to *basis*, section 334(b)(1) [4] provides that if property is received in a distribution in complete liquidation of another corporation in a transaction qualifying under section 332, the basis of the property is the same as it would be in the hands of the subsidiary. An exception to this rule is provided by section 334(b)(2) for cases in which 80 percent or more of the stock of the subsidiary is acquired by purchase within a period of not more than 12 months and the liquidation takes place within 2 years after the acquisition of control. Under these circumstances, basis to the parent is determined by allocating the cost of the stock among the assets distributed.

However, the exception provided by section 334(b)(2) applies only in cases where stock control has been acquired by purchase. In the instant case stock control was acquired in a section 368(a)(1)(B) reorganization, and, hence, the basis of the Button *stock* to petitioner was not determined by cost, but by reference to the basis of the old Button stockholders under section 362(b). [5] Accordingly, the special basis rule of section 334(b)(2) does not apply. Petitioner therefore took the distributed property at the same basis which it had in the hands of Button pursuant to section 334(b)(1).

Petitioner points out that since the distributed property retained the same basis in its hands as it had in Button's hands, section 1223

---

[3] SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

(a) GENERAL RULE.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.

(b) LIQUIDATIONS TO WHICH SECTION APPLIES.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—

(1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends) ; and either

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; * * *

[4] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

(1) IN GENERAL.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor. * * *

[5] SEC. 362. BASIS TO CORPORATIONS.

(b) TRANSFERS TO CORPORATIONS.—If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer.

(2)[6] applies, "tacking" to the period for which petitioner held the property transferred to it upon the complete liquidation of Button the period for which such property was held by *Button*. Having arrived at this point, petitioner then construes the "tacking" provisions of section 1223(2) to mean that "since petitioner 'has held' the property while the property was held by Button, petitioner *owned* the property while it was used in the business [of Button]." (Emphasis ours.) It is further suggested that none of the property in question—inventories, accounts receivable, real estate, equipment, machinery, and other depreciable property—ordinarily constitutes a capital asset within the meaning of section 1221.[7] From this analysis petitioner theorizes that the non-capital asset "characteristics" which the distributed property had in the hands of Button, the subsidiary and transferor, should be carried over upon section 332 liquidation to petitioner, the transferee-parent, regardless of what character would otherwise have been ascribed to the same assets in petitioner's hands in the *absence* of such a liquidation.

Petitioner has stated on brief that this case "rests primarily on the broad proposition that in a section 332 liquidation the character of the assets passing to the parent upon the liquidation of the subsidiary is unchanged in the liquidation."

Respondent has taken an opposite position. Looking to the Button assets solely in the hands of petitioner, whose business was totally unrelated to that of Button, he has determined them to be capital assets within the meaning of section 1221 of the Code, and, accordingly, ruled that the loss suffered by petitioner upon the sale of such assets is a capital loss for Federal income tax purposes.

Respondent argues that the term "capital asset" includes all classes of property not specifically excluded by section 1221, citing Regula-

---

[6] SEC. 1223. HOLDING PERIOD OF PROPERTY.
  For purposes of this subtitle—
  * * * * * *
  (2) In determining the period for which the taxpayer has held property however acquired there shall be included the period for which such property was held by any other person, if under this chapter such property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as it would have in the hands of such other person.

[7] SEC. 1221. CAPITAL ASSET DEFINED.
  For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
  (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
  (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;
  * * * * * *
  (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); * * *

tions 1.1221–1(a). He admits that the assets in question were accounts receivable, inventories, real estate, and depreciable property used or acquired by Button in carrying on its business and were, therefore, not capital assets in Button's hands. However, respondent contends that in order to qualify as other than capital assets *in the hands of petitioner*, these assets must be: (1) Accounts receivable *acquired by* petitioner in carrying on *its* business; (2) inventories *of* petitioner used in carrying on *its* business; and (3) real estate and depreciable property *used by* petitioner in *its* business. It is the respondent's position that the assets in question, in addition to falling within particular categories of property enumerated, must have been acquired or used by petitioner in carrying on *its* business in order to fall within the exceptions provided by section 1221, and since this element of acquisition or use in connection with a business of the petitioner is completely lacking in the instant case, the assets in question, in the hands of petitioner, are capital assets.

We agree with respondent. It is the petitioner who is before us. Regardless of what nature the assets in question had in the hands of its predecessor in title, our concern is with their tax nature in petitioner's hands. Were the assets acquired or used in connection with a business of petitioner? The principal business activity of petitioner was the manufacture and sale of precision switches and thermostatic controls. No evidence has been introduced showing that petitioner was in, or ever intended entering, the button business. Petitioner has argued that it in fact owned, operated, and used in its business the assets for a short time on June 30, 1955, between the time when those assets were distributed to it upon the liquidation of Button and the time when the transaction with Talon was closed. We find that ownership for such a minimal, transitory period is insufficient to establish "use" of the distributed assets in petitioner's business or to place petitioner in the button business.

Petitioner has also argued that where one of the essential purposes of acquiring property is to sell it, the property does not qualify as a capital asset, citing *Rollingwood* v. *Commissioner*, 190 F. 2d 263 (C.A. 9, 1951). Section 1221, of course, provides that the term "capital asset" does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The critical language here is—*in the ordinary course of the taxpayer's trade or business*. In ascertaining whether the assets acquired for sale were so acquired in the ordinary course of the taxpayer's trade or business, "the test normally applied * * * is the frequency and continuity of the transactions claimed to result in a trade or business," *Rollingwood*, *supra*. We find *no* evidence in the instant case showing petitioner to have been in the business of selling assets such as those

385

involved herein, much less that such assets were sold with any degree of "frequency and continuity" as required by *Rollingwood*.

Petitioner has stated that its case, however, rests *primarily* on the broad proposition that in a section 332 liquidation the "character" of the assets passing to the parent upon liquidation of the subsidiary is unchanged in the liquidation. It has argued that the whole scheme of the law in the field of reorganizations and section 332 liquidations is to maintain existing tax characteristics and that this is manifested by the fact that the tax basis of the property so acquired carries over to the distributee under section 334(b)(1) and where the distributee takes such property upon the distributor's basis the distributee's holding period includes the period for which such property was held by the distributor under section 1223(2).

Petitioner points out that a finding by this Court that the non-capital asset character of the property in Button's hands carries over in liquidation to the property in petitioner's hands would not have a different ultimate result (i.e., that petitioner would be entitled to an ordinary loss which could then be utilized under section 381) than if petitioner had originally proceeded by causing Button to sell the assets at a loss, liquidate, and distribute the loss to petitioner under section 332. We are not persuaded by this line of reasoning. The taxpayer fashions the mold in which the transaction is cast. This is no case of substance versus form. We are dealing with substance alone, and the substance of the instant series of transactions is actually what was done. That it could have been accomplished in another manner resulting in ordinary treatment is not persuasive that the same treatment should be accorded when a different plan is utilized.

For support of its proposition that the "character" of the assets passing to the parent upon liquidation of the subsidiary is unchanged in the liquidation, petitioner points out the recognition accorded by other courts to the "carry-over of tax attributes" in the area of corporate liquidations. In this connection petitioner has relied heavily on *Advance Aluminum Castings Corporation* v. *Harrison*, 158 F. 2d 922 (C.A. 7, 1946). In that case the Seventh Circuit held:

when a corporation receives property from another corporation within the meaning of Sec. 112(b)(6) [of the Revenue Act of 1936, providing for nonrecognition of gain or loss on property received by one corporation upon complete liquidation of another], as Castings [the parent] received the installment sales contracts from Pattern [the wholly owned subsidiary], such receiving corporation receives it on the same basis for tax purposes as it was held by the liquidated corporation. * * * Sec. 113(a)(15) [of the Revenue Act of 1936, providing that property received by one corporation in a complete liquidation of another corporation to which sec. 112(b)(6) applies has the same basis in the hands of the transferee as it had in the hands of the transferor]. Since the property Castings received from Pattern was property which Pattern held with the privilege of making returns on the installment basis, Castings held the same property with the same privilege and on the same basis.

We find *Castings* distinguishable from the instant case. There the evidence indicated that both parent and subsidiary were engaged in the same or similar businesses, and the property transferred did have the same "character" (i.e., was used similarly) both in the hands of the subsidiary and in the parent's hands. In the instant case there was no such similarity between the business of Button and petitioner's business. The property did not have the same "character" in the hands of petitioner as it did in Button's hands. Further, in *Castings* there was a continuity; the parent continued the subsidiary's operation, utilizing *itself* the property transferred in the *same* way in which the subsidiary utilized it. In the instant case there was no such continuity—petitioner and button were engaged in two entirely unrelated businesses. Nor, as stated earlier, can we find that the momentary vesting of Button's assets in petitioner on June 30, 1955, was sufficient to place petitioner in the button business or to provide the continuity of similar use which we think formed the basis for the holding in *Castings*.

It is our opinion that petitioner neither acquired nor used the Button assets in *its* business, neither did petitioner enter into the button business. Petitioner held the assets in question as capital assets. The sale of such assets resulted in a capital loss to petitioner.

Reviewed by the Court.

*Decision will be entered under Rule 50.*